D. E. Casey and M. D. Casey v. Commissioner.
Casey v. Commissioner
Docket No. 63067.
United States Tax Court
T.C. Memo 1960-227; 1960 Tax Ct. Memo LEXIS 64; 19 T.C.M. (CCH) 1271; T.C.M. (RIA) 60227; October 25, 1960
*64 1. Held, (a) petitioners are not entitled to reduce their income for the years involved for losses from wheat shrinkage; (b) petitioners are not entitled to exclude from income in 1954 the proceeds of sale of certain wheat futures purchased in 1953 and 1954; and (c) petitioners overstated purchases of wheat in 1954 in the amount of $23,850. 2. Court is without jurisdiction to determine petitioners' tax liability for the years 1957, 1958, and 1959. 3. Addition to tax under section 294(d)(1)(A), I.R.C. 1939, approved. Walker Casey, Esq., Third National Bank Bldg., Nashville, Tenn., for the petitioners. George L. Hudspeth, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax *65 as follows: Addition to Tax, I.R.C. 1939
Defi-
Sec. 294
Sec. 294
Year
ciency
(d)(1)(A)
(d)(2)
1953
$ 114.30
1954
5,854.81
$686.05
$342.35 By amended answer respondent claimed an additional deficiency and addition to tax under section 294(d)(1)(A) for the year 1954 in the amounts of $14,956.57 and $1,377.48, respectively. The deficiency for 1953 is composed entirely of self-employment tax and has been conceded by petitioners. Respondent has waived the addition to tax under section 294(d)(2) and also concedes that petitioners are entitled to a net-operating loss carryback from 1956 to 1954 in the amount of $4,403.11. The issues for decision are: (1) Whether petitioners suffered and are entitled to deduct wheat shrinkage losses of 2 per cent of the wheat handled by their partnership business; (2) whether the proceeds from the sale of certain wheat futures are excludible from petitioners' income; and (3) whether the delivery by petitioners of wheat to Dixie Portland Flour Co. represented a "sale," the proceeds from which would be includible in their income; and if not, whether the wheat so delivered should be excluded from petitioners' "purchases. *66 " Findings of Fact Petitioners D. E. Casey and M. D. Casey, husband and wife residing in Franklin, Tennessee, throughout the years material hereto, were engaged in business as a partnership under the name of Lillie Mill Company (hereafter referred to as Lillie Mill). They filed joint and partnership income tax returns for the calendar years 1953 and 1954 with the district director of internal revenue, Nashville, Tennessee. During the taxable years, and for many years prior thereto, the partnership owned and operated a flour mill and grain elevators in which were stored wheat for farmers and the Commodity Credit Corporation (hereafter, CCC) on a rental basis, as well as wheat owned directly by the partnership. Lillie Mill kept its books and reported its income on an accrual basis of accounting. Its wheat inventory at the end of each year was physically measured by a system approved by CCC, and the resulting figure was used as the ending inventory on the partnership return for that year and as the beginning inventory figure for the next year. Among their books petitioners maintained a ledger account in respect to the wheat they owned directly. Therein they recorded as debits their *67 wheat purchases and recorded as credits their wheat sales. This account was balanced and closed out each year. In 1954 a debit (or "purchase") balance, evidencing an excess of purchases over sales in their wheat operations, of $38,610.16, together with a debit balance of $321.60 from their corn account, was carried over to the partnership's income tax return and shown as "purchases" in its computation of cost of goods sold. On December 31, 1954, there was no wheat in the Lillie Mill elevators. The partnership reported no ending inventory on its 1954 return. On December 7, 1953, petitioners purchased through the brokerage firm of Merrill Lynch, Pierce, Fenner & Beane (hereafter, Merrill Lynch) May futures in wheat in the amount of 10,000 bushels at a cost of $20,900.45. Petitioners deposited $2,000 in their margin account with Merrill Lynch to cover the purchase. By entry of December 28, 1953, this $20,900.45 transaction was recorded in the partnership's wheat ledger account as a purchase of wheat. Additional May wheat futures to the extent of 5,000 bushels and $10,656.33 were purchased by petitioners on January 19, 1954, in connection with which they deposited $1,000 in their Merrill *68 Lynch margin account. On February 4, 1954, this $10,656.33 was treated as a wheat purchase and debited to the partnership's wheat account. Petitioners closed out their May wheat futures on February 23, 1954, by the sale through Merrill Lynch of 15,000 bushels for $32,546.53. They received from Merrill Lynch $3,989.75, representing their $3,000 margin investment and $989.75 profit. This sale was reflected in the partnership's wheat account by three credit entries under date of December 16, 1954, in the amounts of $10,656.33, $989.75, and $20,900.45, for a total of $32,546.53. No delivery was ever taken of the 15,000 bushels of wheat bought on futures contracts by petitioners, and the 10,000 bushels purchased in December 1953 were not included in the partnership's inventory as of December 31, 1953. Petitioner D. E. Casey, in addition to his partnership interest in Lillie Mill, also owned 50 per cent of the capital stock of Williamson County Loose Leaf Tobacco Warehouse, Inc. (hereafter, Warehouse), at Franklin, Tennessee. Its principal business was that of an auction house for the sale of loose-leaf tobacco. It did, however, on at least one occasion store wheat on its floors for *69 CCC for which it was paid rent. In May 1954 CCC sent out wires soliciting bids for the sale of 48,475.24 bushels of wheat that were stored in the Lillie Mill elevators. Such an invitation was sent to the parnership, which responded with a bid to purchase the wheat at $1.59 a bushel. Lillie Mill's bid was shortly thereafter accepted by CCC. On June 28, 1954, CCC billed Lillie Mill for $77,075.63, the cost of the 48,475.24 bushels at $1.59 a bushel, and on July 9, 1954, CCC presented to Harpeth National Bank of Franklin, Tennessee, a sight draft for $77,075.63 to be charged to the account of Lillie Mill. In the meantime, on June 14, 1954, Lillie Mill leased its mill to Dixie Portland Flour Co. (hereafter, Dixie Portland), at Chattanooga, Tennessee; the partnership retained and continued to operate its grain elevators. Upon Dixie Portland's immediate request for wheat with which to start up its mill operation, Lillie Mill delivered to the former 15,000 bushels of wheat from the grain elevators. At $1.90 per bushel Dixie Portland was billed for $28,500 on an invoice dated June 25, 1954, and on which Lillie Mill's name had been stricken and the name of Warehouse substituted. The invoice *70 was paid in full by check made out by Dixie Portland to the order of Warehouse and deposited to its account in the Harpeth National Bank. The $28,500 was not reflected as a sale on the books of either Warehouse or Lillie Mill. The sight draft for $77,075.63 presented by CCC to the Harpeth National Bank on July 9, 1954, was taken up and paid by Warehouse by a check drawn on its account. The funds to cover this check were derived for the most part by Warehouse from the $28,500 paid it by Dixie Portland on June 25, 1954, and from the $47,970.07 that had been transferred by Lillie Mill from its bank account to the account of Warehouse on June 12, 1954. On December 31, 1954, $77,075.63 was debited as a purchase to Lillie Mill's wheat ledger account. It was included at the close of the year in the account's debit balance that was carried over to Lillie Mill's tax return as merchandise purchased. Other than the sale of the May wheat futures, Lillie Mill's wheat account recorded only two sales of wheat in 1954, both to Dixie Portland, on November 15 and December 16 in the amounts of $4,995 and $16,100, respectively. All of the wheat owned and available for sale by Lillie Mill was reflected *71 in this account. The partnership reported an opening inventory for 1954 of $5,065.68. On their joint return for 1954 petitioners claimed a net-operating loss carryover from 1953 of $46,601.54. Respondent in his notice of deficiency allowed petitioners a net-operating loss carryover from 1953 to 1954 of $28,736.13. The reduction in the amount of the carryover resulted from reducing the net-operating loss carryover from 1950 by $17,500, the amount of the net long-term capital gain reported for that year, and several minor adjustments all favorable to petitioners. Ultimate Findings Petitioners are not entitled to reduce their income for any of the years involved because of losses from wheat shrinkage. Petitioners are not entitled to reduce their income for 1954 by eliminating from sales the proceeds from the sale of 15,000 bushels of May wheat futures in February of 1954. Petitioners' income for 1954 should be increased by $23,850 by eliminating from purchases the cost of 15,000 bushels of wheat purchased by Dixie Portland and delivered from petitioners' grain elevators. Petitioners are entitled to a net-operating loss carryback from 1956 to 1954 in the amount of $4,403.11. *72 Opinion Petitioners do not contest any of the adjustments made by respondent in the notice of deficiency - rather they claim that their income for all years should be reduced by losses from wheat shrinkage which were not reflected in the partnership accounting and their returns, and that their reported income for 1954 should also be reduced by eliminating from sales as reported by the partnership all but the profit on the May wheat futures bought in December of 1953 and January of 1954 and sold in February of 1954. Respondent denies petitioners are entitled to reduce their income by the above adjustments and, by amended answer, claims income for 1954 should be increased either by the amount of $28,500, because of an unreported sale of 15,000 bushels of wheat to Dixie Portland, or by the amount of $23,850, representing the cost of the 15,000 bushels of wheat which petitioners included in purchases for the year 1954. The issues, for the purposes of a decision in this case, are all purely factual, and will be discussed separately. Losses from Wheat Shrinkage Shrinkage losses were not claimed on petitioners' tax returns, but the issue was raised in the petition. Petitioners *73 have the burden of proof on this issue. The evidence consisted of testimony of petitioner D. E. Casey and his former bookkeeper to the effect that because of extraneous matter contained in the wheat when it is placed in the grain elevators, and because of rats eating the wheat while it is stored, and for other reasons, the amount of wheat that can be sold is at least 2 per cent less than the wheat purchased. Petitioners also introduced certain ledger sheets from the Lillie Mill partnership books in an effort to explain why they did not receive credit for these losses in their income reported. Both Casey and the bookkeeper testified that the opening and closing inventories reported on the tax returns for all years was a physical inventory measured and calculated by a method approved by CCC - and that is not disputed. Respondent does not argue that the shrinkage losses do not occur, but rather that the losses are already reflected in petitioners' reported income. While the method of accounting for wheat purchases and sales used by petitioners, as explained in our Findings of Fact, would not reflect these losses if book-inventory figures were used for computing income, and would in *74 all likelihood indicate a different inventory balance than a physical inventory would reveal, it nevertheless appears to correctly reflect petitioners' income where physical inventories are used to compute income. A closing inventory based on physical count seems bound to reflect shrinkage each year, thereby increasing the cost of goods sold and reducing gross profit by the amount of the shrinkage. This would appear to be even more certain over the period of years here involved where the ending inventory for 1954 is zero. And because of the net-operating loss carryovers from 1952 to both of the years here involved, even if the computations did not accurately reflect income on a year-to-year basis, the tax result would be the same in any event. Petitioners have failed to show that they are entitled to reduce their reported income for shrinkage losses. Sales of Wheat Futures These sales were included in the income reported by petitioners for the year 1954 and petitioners first raised this issue by amendment to their petition. Petitioners have the burden of proof on this issue. The evidence shows that petitioners purchased 5,000 bushels of May wheat futures at $2.09 per bushel, *75 and another 5,000 bushels at $2.09 1/8 per bushel, on December 7, 1953; and that $20,900.45 was debited to their wheat purchases account and included in cost of goods sold for 1953. This wheat was never delivered and was not included in the ending inventory for 1953 because the inventory was taken by physical count. Petitioners deposited $2,000 in their margin account with the brokers from whom they purchased the futures in December 1953 but did not enter this amount in purchases. Petitioners also purchased an additional 5,000 bushels of May wheat futures at $2.13 1/8 per bushel on January 19, 1954, depositing an additional $1,000 in their margin account. $10,656.33 was debited to their wheat purchases account and included in cost of goods sold for 1954. Petitioners sold the 15,000 bushels of May wheat so held on open contract for $2.17 3/8 per bushel on February 23, 1954, realizing a profit thereon of $989.75. Petitioners received from the brokers the amount of $3,989.75 representing the $3,000 deposited in their margin account, plus the profit. Petitioners credited their wheat account with the cost of the 15,000 bushels, being $20,900.45 and $10,656.33, and with the profit of *76 $989.75. Because of petitioners' method of accounting, these credits were offset against petitioners' wheat purchases for 1954, thereby reducing cost of goods sold and increasing gross profit, rather than being added to gross receipts. Petitioners' contention seems to be that these were mere hedging operations, and because the wheat was never delivered, this was not a true sale, and only the profit portion of the total sales price should have been credited to the wheat account or included in sales. It is not necessary for us to decide whether these transactions should have been included in purchases or inventory at the time they were entered into or whether they were capital or ordinary business transactions, see Modesto Dry Yard, Inc., 14 T.C. 374, because it is clear that if the cost of the wheat futures is to be excluded from sales it must also be eliminated from purchases, which would have the same net result on income. The only difference might be that if this was considered an actual purchase and sale of wheat, it would result in understating income for 1953 and overstating income for 1954 because the $20,900.45 of wheat purchased in December of 1953 was not included *77 in inventory at the end of that year or at the beginning of 1954. But even though the accounts might not have correctly reflected the income for each year, they did correctly reflect the income for the 2-year period, and because of the net-operating loss carryover from prior years to both 1953 and 1954, the net tax result would be no different. If the $20,900.45 is eliminated from purchases for 1953 or added to ending inventory for 1953, the cost of goods sold for 1953 would be decreased and profit increased, thereby absorbing more of the net-operating loss carryover from prior years and reducing the amount of the carryover to 1954 by a like amount. There is no question of a long-term capital gain on these transactions because they were all consummated within 6 months' time. This issue must be decided for respondent. Sale of Wheat to Dixie Portland Flour Co. This issue was raised in the alternative by respondent by amendments to his answer. The burden of proof is on respondent. The evidence is that as soon as Dixie Portland bought the flour mill from the partnership in June of 1954 they asked petitioners for 15,000 bushels of wheat to operate the mill. The 15,000 bushels *78 were delivered from petitioners' elevators, but petitioners' records indicate that they did not own that much wheat at that time. However, their bid for 48,475.24 bushels of wheat, at a price of $77,075.63, belonging to CCC and stored in their elevators, had been accepted by CCC prior to June 1954, although petitioners were not billed for it until July. For some unexplained reason Dixie Portland was invoiced for this wheat by Warehouse, and paid the purchase price of $28,500 to Warehouse on June 25, 1954. Also, for some unexplained reason, on June 12, 1954, Lillie Mill had transferred $47,970.07 from its bank account to the account of Warehouse. On July 9, 1954, CCC presented to petitioners' bank a sight draft against Lillie Mill for the $77,075.63 purchase price of the 48,475.24 bushels Lillie Mill had successfully bid on. Apparently using the $28,500 received from Dixie Portland and the $47,970.07 received from Lillie Mill, and a small amount of its own funds, Warehouse paid the sight draft on July 9, 1954. There is no explanation of whether Warehouse was acting as agent for Lillie Mill or in its own behalf when it paid for this wheat. The $28,500 was not included in sales by either *79 Warehouse or Lillie Mill. There is no evidence whether Warehouse included the $77,075.63 in its purchases, but in December 1954 the $77,075.63 was debited to Lillie Mill's wheat account as a purchase and was included in the computation of petitioners' cost of goods sold for 1954. The bookkeeper's explanation of why this entry was made was that when another sale of wheat in the amount of $16,100 was made to Dixie Portland in December of 1954 she told petitioner that she had to give Warehouse a "check for that $16,100 against the wheat that the Williamson County Tobacco Warehouse had sold or had to put the purchase of the wheat on the books. I had to do something with it or else I was going to show a $16,100 profit on the wheat account and not show anything on the side where the wheat was purchased." It is apparent from the Lillie Mill wheat account and its beginning inventory for the year 1954 that the wheat sold to Dixie Portland in 1954 must have come primarily from the 48,475.24 bushels of wheat stored in petitioners' elevators and bought by either Lillie Mill or Warehouse from CCC, because the other purchases of wheat by Lillie Mill in 1954, when added to the beginning inventory, *80 totaled less than the wheat sold to Dixie Portland in 1954. While the evidence with respect to who actually owned and sold the 15,000 bushels of wheat to Dixie Portland is, at best, confusing, it is clear that petitioners included the cost of this wheat in their purchases and did not include the sale in income, and that the wheat was not on hand at the end of the year; so respondent has carried his burden of proving that either petitioners' sales should be increased by this sale or their cost of goods sold reduced by the cost of this wheat. However, what evidence we have indicates that Warehouse paid CCC for the wheat and received the check from Dixie Portland for the sale of 15,000 bushels of the wheat, and there is nothing in the record to indicate that petitioners ever received the profit on this sale. Respondent has failed to prove that this was a sale made by petitioners and we have consequently found that petitioners' cost of goods sold should be reduced and their income increased in 1954 in the amount of $23,850, representing the cost of the 15,000 bushels of wheat. In their amendment to petition, petitioners "move the Court to include in the determination by Respondent *81 of their tax, the years 1957, 1958, and 1959, since the partnership d/b/a Lillie Mill Company has been dissolved and is no longer in business." Respondent has not determined deficiencies in petitioners' tax liability for the years 1957, 1958, and 1959 and this Court has no jurisdiction to determine petitioners' tax liability for those years in this proceeding. Sec. 6214(b), I.R.C. 1954. Petitioners offered no evidence with respect to their failure to file a declaration of estimated tax for the year 1954 and the addition to tax under section 294(d)(1)(A) of the 1939 Code is approved. Decision will be entered under Rule 50.